IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Zauderer Associates, Inc., | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | C.A. No. 2:03-1864-23 |
| | ) | |
| v. | ) | **FINDINGS OF FACT** |
| | ) | **AND** |
| | ) | **CONCLUSIONS OF LAW** |
| C&J Industries, Inc., | ) | |
| Defendant, | ) | |
| _____ | ) | |

This matter was tried without a jury on May 10, 2005. The court–having heard the arguments, read the briefs of counsel, and considered the evidence – enters a judgment in favor of Plaintiff Zauderer in the amount of $93,888.63 but concludes that Plaintiff is not entitled to attorney's fees based on the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1.  This case arises from a contract dispute between Plaintiff Zauderer Associates ("Zauderer") and Defendant C&J. Plaintiff Zauderer is an independent commissioned sales representative for products such as the injection molding plastic products manufactured by Defendant C&J Industries.

2.  On February 13, 1997, Zauderer and C&J entered into a sales agreement (hereinafter the "1997 Agreement") which appointed Zauderer as C&J's exclusive agent in a large territory including Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia.

3.  The 1997 Agreement was a one year contract, but automatically renewed for consecutive one-year terms. Either party could terminate the sales agreement by giving the other

party ninety days notice and written notice of termination by registered or certified mail.

    4.     The 1997 Agreement provided that

> Unless otherwise stipulated, [C&J] shall pay five percent (5%) commission to [Zauderer] on the net amount of all sales of Injection Molded Plastic Parts, which are accepted by [C&J] during the term of this agreement. All orders placed with [C&J] from companies within the assigned territory and from assigned turned over accounts shall be deemed commissionable regardless of when the orders are eventually shipped and invoiced.

(Pl. Ex. 1).

    5.     In 1997, Zauderer actively solicited Michelin's business for C&J in South Carolina. At the time, Michelin had contracted to provide the tire, wheel, and related components to the Segway Human Transporter, thus Zauderer believed this would be a lucrative contract for C&J.

    6.     On August 28, 2000, Michelin, Zauderer, and C&J entered into an agreement (hereinafter the "2000 Agreement"). The Agreement provided that C&J would pay Zauderer five percent commissions on the value added processes C&J provided under the program.

    7.     Under the 2000 Agreement, C&J agreed that it would pay this commission on:

> [1] The injection over molding process in producing the Wheel Rim. This \
> includes the manufacturing costs, resin, and labor. It excludes the Hub Insert cost.
> [2] The assembly portion only of our selling price to assemble the valve stem, bolt, keeper, and tire.

(Compl., Ex. 2).

    8.     On October 28, 2002, C&J wrote to Zauderer that, effective the very next day, it had decided to terminate the 1997 agreement. C&J explained that "[d]ue to market conditions and a change in corporate philosophy, we have decided to rationalize our sales structure." (Compl., Ex. 3).

9.  C&J informed Zauderer that it would honor the termination clause contained in the agreement, which provided that

> [i]n the event of termination, commissions will remain in effect on all reorder sales for a period of nine (9) months from the beginning of the ninety (90) day cancellation notice. Any outstanding quotation(s) resulting in an order during the ninety (90) days shall be credited to the representative and commissions paid until six (6) months from receipt of order.

*Id.* at ¶ K.

10. On November 20, 2002, Defendant C&J entered into a "Wheel Manufacturing and Tire Mounting Service Agreement" with Michelin (hereinafter "the Michelin agreement"). Under the agreement, Michelin granted C&J the exclusive right to manufacture components and perform assembly work for at least two million Segway wheel assemblies.

11. Zauderer instigated this action on June 3, 2003. Zauderer contended that C&J's termination constitutes a wrongful termination in violation of the termination provisions of the 1997 Agreement. Zauderer also maintained that C&J had failed to pay commissions owed to it under the parties' agreements.

12. Defendant C&J moved for summary judgment on July 12, 2004. The court denied C&J's motion on September 27, 2004.

13. Prior to a bench trial held before this court, the parties agreed to a settlement of a number of the issues presented (hereinafter "the settlement agreement").

14. As of May 6, 2005, Zauderer and C&J agreed that

(a)  C&J would pay Zauderer commission on all sales made to Michelin from July 21, 2003, the date of the last invoice on which Zauderer was paid commission, until the end of the Michelin/Segway Wheel Assembly Program; and
(b)  C&J would pay Zauderer five percent commission on all sales to Segway

until nine months from the date of Zauderer's termination.

*See* Joint Letter of May 6, 2005.

15.	The parties also agreed that the court was to make a non-appealable determination as to two remaining issues. Those issues are

(a)	Whether Zauderer is owed any outstanding commissions associated with sales of OFS Fitel, and if so, the amount of such commissions; and
(b)	Whether the South Carolina Payment of Post-Termination Claims to Sales Representatives Act (hereinafter "the Post-Termination Claims Act") applies to Zauderer's claim for unpaid commissions. With respect to this issue, the parties agreed that in the event that the court determines that the Act applies, Zauderer is entitled to recover reasonable attorney's fees on this claim. Finally, Zauderer agreed to waive its entitlement to seek multiple damages under the Post-Termination Claims Act.

*Id.*

16.	With respect to the first issue, OFS Fitel was one of the customers for which Zauderer was to be paid commissions

17.	In 2002, OFS Fitel made a decision not to continue purchasing product from Defendant C&J.

18.	At the end of the relationship between OFS Fitel and C&J, OFS purchased a large quantity of product from C&J.[1]

19.	The rate of commission for sales to OFS Fitel, as set forth in the 1997 agreement, is five percent.

---

[1]	At the Plaintiff's deposition of defendant's corporate designee, the designee acknowledged that C&J and OFS Fitel executed an "Exit Agreement" whereby C&J sold approximately $1.1 million in products to OFS Fitel.

Plaintiff asserted, and Defendant acknowledged at the hearing on this matter, that it did not produce documentation setting forth the actual amount paid to defendant by OFS Fitel and the basis for that payment until just before the hearing. (Transcript at 9:5-10; 11:3; 16:9-13).

20.     A summary of the final purchase of OFS Fitel is set forth in Plaintiff Exhibit 2. Plaintiff's Exhibit 2 reflects sales in the amount of $1,933,869.87. Zauderer seeks commissions on three of the 11 categories reflected on Plaintiff's Exhibit 2: Finished Goods and Fabricated Inventory of $452,290.64; Purchased Component Inventory of $1,075,624.36; and Accounts Receivable of $349,857.90.

21.     The court conducted a bench trial on the outstanding issues on May 10, 2005, and

issues the following Conclusions of Law in accordance therewith.

## II.  CONCLUSIONS OF LAW

### A.     Commissions Owed in Association with OFS Fitel

1.     "Basic contract law provides that when a contract is clear and unambiguous, the language alone determines the contract's force and effect." *Lewis v. Premium Inv. Corp.*, 568 S.E. 2d 361, 363 (S.C. 2002).   The contract's terms "must be construed to give effect to their plain, ordinary, and popular meaning."  *Dorman v. Allstate Ins. Co.,* 504 S.E.2d 127, 129 (S.C. Ct. App. 1998).

2.     In ascertaining the intention of contracting parties under South Carolina law, the court must first look to the language of contract; if the language is clear and capable of legal construction, the language alone determines force and effect of instrument. It is not the function of the court to rewrite contracts for parties.  *Lewis*, 568 S.E.2d at 363.

3.     The three categories of sales to OFS Fitel on which Plaintiff seeks commissions total $1,877,711.  As mentioned above, these categories include: Accounts Receivable, Purchased Component Inventory, and Finished Goods and Fabricated Inventory.

4. The applicable rate of commission for this product is five percent, as set forth in the 1997 Agreement.

**Accounts Receivable**

5. The accounts receivable amount of $349,857.90 is commissionable to Zauderer at a rate of five percent.

6. Plaintiff asserts, and Defendant acknowledges that this item is commissionable to Plaintiff as sales to a customer within Plaintiff's exclusive territory. The defense raised by Defendant, on which it bears the burden of proof, is that it paid commissions on this amount.

7. Defendant has not established that it paid commissions on the accounts receivable. After the hearing, Defendant submitted a May 13, 2005 letter and Defendant's Exhibits 16 and 17. Those exhibits, and Exhibit 15, identify only sales to Lucent Technologies and limited sales to OFS Brightwave, which are different companies than OFS Fitel. (Transcript at 53:21-23; 46:21-48:1.).

8. Plaintiff is entitled to commissions, for accounts receivable, in the amount of $17,492.89.

**Finished Goods and Fabricated Inventory and Purchased Component Inventory**

9. The Finished Goods and Fabricated Inventory of $452,290.64; and Purchased Component Inventory of $1,075,624.36 are commissionable to Zauderer at a rate of five percent.

10. Defendant acknowledges that the product sales at issue are generally commissionable but defends its decision not to pay commissions by contending that there was

not an order.  (Transcript at 23:10 - 24:3)[2]

11.     The parties' 1997 Agreement clearly and unambiguously requires the Defendant to pay the five percent commission on "the net amount of all sales" "within the assigned territory."  Deposition testimony of Dale Owens offered at the bench trial further affirms that the sales representative was to receive commissions on all sales within a sales representative's exclusive territory, excluding house accounts:

> Q.   So the rep gets commissions on all sales within their territory, excluding house accounts?
> A.   Correct.

(Owens Dep. at 37:8-10); *see also* Owens Dep.at 124:2-15.  The 1997 agreement states that Zauderer had an exclusive territory.  (Plaintiff's Exhibit 1 at par A and E).

12.     Further, Defendant's Exhibits 2 and 9, providing a detail of the Purchased

---

[2]  At the hearing, Mark Fuhrman testified as follows:

> Q.   I'm going to hand you a letter that's been marked as Plaintiff's Exhibit 2, and I'm going to ask you, do you recognize that document?
> A.   Yes.
> Q.   And is that the document that ultimately reflected the total payment from OFS to C&J?
> A.   Yes.
> Q.   And does it also reflect the -- what was included in the payment?
> A.   Yes.  It includes an itemized listing of everything that he purchased.
> Q.   And why wasn't Zauderer paid commission on that OFS buyback number?
> A.   It was not an order.
> Q.   For the sake of this hearing, if there had been an order, is there anything included in that buyback letter that would have been commissionable to Zauderer?  Had an order been placed?
> A.   Yeah.  I just -- there wasn't an order...

Transcript at 23:10-24:3.

Component Inventory and the Finished Goods and Fabricated Inventory establish that the items at issue were being shipped and paid for in accordance with instructions from OFS Fitel: These documents, addressed from Defendant to OFS Fitel, state that the items at issue were being "shipped per OFS instruction upon confirmation of funds being wire[] transferred to C&J Industries." (Defendant's Exhibits 2 and 9). The instruction from OFS Fitel to C&J to ship product constitutes an order.[3]

13.     At issue here is Finished Goods and Fabricated Inventory of $452,290.64; and Purchased Component Inventory of $1,075,624.36, which sales were shipped to a company within Plaintiff's territory and paid for by that company, and that payment was accepted by Defendant. Under the plain language of the 1997 agreement, these sales are commissionable to Zauderer.

14.     To the extent that Defendant suggests that there was a modification that would require the application of a commission other than the five percent provided for in the 1997 agreement, or not paying commissions on parts purchased from third parties, the court finds no basis for deviating from the standard provisions concerning commissions in the 1997 Agreement.[4]

---

[3] The 1997 Agreement contains no particular or special definition of "order" and does not specify any type of documentation, providing simply that "All orders placed with the PRINCIPAL from companies within the assigned territory and from assigned turned over accounts shall be deemed commissionable regardless of when the orders are eventually shipped and invoiced." In fact, the 1997 agreement clearly reflects that the shipment of product constitutes an order.

[4] The 1997 agreement required a writing to change the rate of commission, and on occasion the parties entered into a separate agreement to change the standard five percent commission rate or the contractual obligation to pay commissions on parts purchased from third parties. The evidence established that there was no such agreement with respect to OFS Fitel.

15. Plaintiff is entitled to commissions in the amount of $22,614.53, for Finished Goods and Fabricated Inventory, and to commissions in the amount of $53,781.21 for Component Inventory.

16. The 1997 agreement provides for payment of commissions "no later than the 15th of the month following the month during which the invoice(s) have been paid to the PRINCIPAL by the customers." Accordingly, commissions on the August 29, 2002 sales became due by September 15, 2002, entitling plaintiff to interest from that date.

### B.  Applicability of the Post-Termination Claims Act

1. The Post-Termination Claims Act provides

> When a contract between a sales representative and a principal is terminated for any reason, the principal shall pay the sales representative all commissions that have or will accrue under the contract to the sales representative according to the terms of the contract.

---

Moreover, Dale Owens testified that commissions were normally paid on parts purchased from a third party:
- Q: And typically did that include things that you had to buy from an outside source?
- A. Yes.
- Q. So the rep would actually be paid commission on the entire sales price on the product that was sold to your customer?
- A. That is correct.

(Owens Dep. at 94:11-17; 93:10-21).

In addition, Mark Fuhrman testified that no agreement to change the standard commission was entered into with respect to OFS Fitel:
- Q. And there was no letter changing the commission from the normal five percent commission with OFS Fitel, was there?
- A. Correct.

(Transcript at 40:6-8). Of course, modification is an affirmative defense on which defendant bears the burden of proof. There is no evidence that the standard commission arrangement was modified with respect to OFS Fitel. Rather, the undisputed evidence reflected that it was not.

9

S.C. Code Ann. § 39-65-20.

2.    When a principal has violated the Act, the sales representative is entitled to sales commissions plus punitive damages up to three times the amount of commissions due,[5] plus reasonable attorney fees and costs. *See* S.C. Code Ann. § 39-65-30.

3.    For purposes of determining whether the Post-Termination Claims Act applies to the matter *sub judice*, the two relevant definitions are "principal" and "sales representative."

4.    The Act defines a "principal" as one who:

(a) manufactures, produces, imports, or distributes a tangible product for *wholesale;*
(b) contracts with a sales representative to solicit orders for the product; *and*
(c) compensates the sales representative, in whole or in part, by commission.

*Id.* § 39-65-10(3) (emphasis added).

5.    A "sales representative" is a person who:

(a) contracts with a principal to solicit *wholesale* orders;
(b) is compensated, in whole or in part by commission;
(c) does not place orders or purchase for his own account or for resale; and
(d) *does not* sell or *take orders for the sale of product to the ultimate consumer*.

*Id.* § 39-65-10(4) (emphasis added).

6.    Both the definitions of "principal" and "sales representative" hinge largely on what constitutes the manufacturing or distribution of products for, and the solicitation of orders for, "wholesale."

7.    "Wholesale" is not defined by the Act. *See, e.g., Lee v. Thermal Engineering Corp.,* 572 S.E. 2d 298, 304-305 (S.C. Ct. App. 2002) ("The South Carolina General Assembly

---

[5] As noted above in the Findings of Fact, Zauderer has agreed to forego multiple punitive damages as part of the settlement agreement.

did not include the definition of 'wholesale' or 'wholesaler' in this Act, and our research has revealed no South Carolina case law that has defined these terms as they relate to this Act.").

8.   As the *Lee* court observed,

> The cardinal rule of statutory construction is that we are to ascertain and effectuate the actual intent of the legislature. [W]ords used therein must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand its operation. The language must also be read in a sense which harmonizes with its subject matter and accords with its general purpose. Where a word is not defined in a statute, our appellate courts have looked to the usual dictionary meaning to supply its meaning. . . . .

*Id.*

9.   The plain and ordinary meaning of "wholesale" is "[t]he sale of goods or commodities [usually] to a retailer for resale, and not to the ultimate consumer." *See* Black's Law Dictionary (8th ed. 2004); *see also Lee,* 572 S.E. 2d at 304.

10.  Similarly, a "wholesaler" is "[o]ne who buys large quantities of goods and resells them in smaller quantities to retailers or other merchants, who in turn sell to the ultimate consumer." *Id.; See also Lee,* 572 S.E. 2d at 304; *Am. Delta Techs., Inc. v. RK Elec. Info. Concepts*, 647 A.2d 1344, 1347 (N.J. App. Div. 1994) (stating where the terms "wholesale" and "wholesale orders" were not defined in its sales representatives statutes, "reference to the usual definition of those terms would apply;" the court noted a "wholesaler" is "[o]ne who buys in comparatively large quantities, and then resells, usually in smaller quantities, but never to the ultimate consumer").

11.  In *Lee,* the South Carolina Court of Appeals considered whether a sales representative for Thermal Engineering Corporation - a company that made curing ovens, paint booths, and control panels used to operate manufacturing equipment - was entitled to

11

commissions under the Act for his solicitation of orders for Thermal's product. *See* 572 S.E. 2d at 303-304.

12. The *Lee* court reasoned that the sales representative was not entitled to attorneys' fees and punitive damages under the Act because he "did not solicit wholesale orders" as required by the Act. According to the court,

> In order to recover attorney's fees and punitive damages, Lee must fit within the parameters of a 'sales representative' as defined in this Act. The evidence at trial was that Lee solicited orders of control panels to manufacturers, who in turn used the items to manufacture equipment. Thus, those placing the orders were, for the most part, the ultimate consumer or end user of the product.

*Id.* at 304.

13. The pertinent question here, then, is whether Zauderer solicited orders from individuals or corporations who were the ultimate consumer or end user of C&J's products.

14. In light of *Lee* and the definition of "wholesale", the court believes that the injection molding plastic products made by C&J were sold to the end user or ultimate consumer of that product. In other words, Michelin, Segway, and others that bought C&J product were the last user of the plastic molded injection parts and did not resell those parts to other entities. Like the control panels at issue in *Lee,* the products C&J sold to Michelin, Segway, and others were used "to manufacture equipment." *Lee*, 572 S.E. 2d at 304.

15. In fact, C&J's Vice President of Finance, Mr. Dale Owens, states in his deposition that C&J does not "have any products that end up on the market as a stand alone under current conditions. We are not what they call an OEM, Original Equipment Manufacturer." (Owens Dep. at 95).

16. The court believes the purpose of the Act is to provide strictly for commissions

on <u>wholesale</u> orders, or the situation where goods are sold to a retailer for resale. *See, e.g., Lee,* 572 S.E. 2d at 304 ("We are persuaded that the Legislature intended the usual dictionary meaning to apply to the term 'wholesale,' and in so intending, limited the application of this Act to a specific class of workers."); *see also Hoffman v. Van Pak Corp.*, 16 S.W.3d 684 (Mo.Ct.App.2000) ("It is clear that in its use of the word 'wholesale' the legislature intended to address a problem in the wholesale distribution system and wholesale markets and did not intend to create additional remedies for all salespersons who are paid by commission. Whether such a remedy should be extended to all commissioned salespeople is a question for the legislature, not the courts.").

17.     Here, the plastic molded injection parts were not sold to any of C&J's partners for resale. While it is true that the plastic molded parts were incorporated into larger products that may have been sold to the public (ie, the Human Transporter), the plastic molded parts themselves were not, in and of themselves, resold. In fact, consumers likely remain unaware that the plastic injection molded parts even exist in the products they buy.[6]

---

[6] Zauderer argues that

> [T]he products at issue were not sold by C&J to the end user or consumer. The products sold to Michelin, Segway, and OFS Fitel were injected molded parts that were incorporated into products made for resale. OFS Fitel resold the cable connectors made by C&J to customers including utilities and contractors. The products and assembly work C&J sold to Michelin and Segway went into the Segway Human Transporter, which was resold. In contrast to the products at issue in *Lee*, the sales at issue here were sales of large quantities of injected molded plastic parts, exclusively for resale.

(Zauderer Pre-Hearing Brief at 4). In the court's opinion, Zauderer's argument misses the mark. Contrary to Zauderer's suggestion, the sales at issue here were <u>not</u> sales of large quantities of C&J's products <u>exclusively for resale.</u> Instead, C&J sold parts for incorporation into another distinct product. No injected molded parts were re-sold. In fact, there was no "re-sale" at all, but instead, two distinct sales: (1) the sale of C&J's component parts to Michelin, Segway, OFS Fitel and others; and (2) these companies' sales of their own respective products, which might

18. As in *Lee,* the entities placing the orders for C&J's plastic molding parts were the end users of the plastic molded parts in question.

19. Accordingly, Zauderer is not a "sales representative" within the meaning of the Act. *See, e.g., Lee,* 572 S.E. 2d at 305 ("The evidence at trial was that Lee solicited orders of control panels to manufacturers, who in turn used the items to manufacture equipment. Thus, those placing the orders were, for the most part, the ultimate consumer or end user of the products.").

20. Because the Act does not apply, Zauderer is not entitled to attorney's fees pursuant to the Act.

## CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Plaintiff Zauderer is entitled to commissions in the amount of $93,888.63 plus the interest accrued thereon from September 15, 2002. It is further **ORDERED** that Plaintiff Zauderer is not entitled to attorneys' fees, as the South Carolina Payment of Post Termination Claims to Sales Representatives Act does not apply.

**AND IT IS SO ORDERED**.

**S/ Patrick Michael Duffy**
**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**July 11, 2005**

---

have as one of many components C&J's injected molded parts.